# CASES

### ARGUED AND DETERMINED IN THE

# SUPREME COURT

#### OF THE

## STATE OF WISCONSIN.

————————

### JOEL PARKER, Complainant, Appellant,

*vs.*

### CHARLES I. KANE et al., Defendants, Appellees.

APPEAL IN EQUITY FROM MILWAUKEE CIRCUIT COURT.(1)

| 4 | 1 |
|---|---|
| 97 | 145 |
| 97 | 190 |

| 4 | 1 |
|---|---|
| 107 | 429 |

The cancelation or destruction of a deed of conveyance of lands by the consent and agreement of the parties, does not operate to revest the title in the grantor.

Though the voluntary destruction of a deed of conveyance of land does not operate to revest the title in the grantor, yet the grantee in such case will not be permitted to give parol evidence of his title, as in case of a lost deed, or its destruction by accident or mistake.

What is sufficient to put a purchaser on inquiry, is good notice—that is, where a man has sufficient information to lead him to a fact, he shall be deemed cognizant of it.

Whatever is sufficient to make it the purchaser's duty to inquire as to the rights of others, is considered legal notice to him of those rights.

Mere rumor or suspicion of a defective title is not sufficient to operate as constructive notice.

Notice to one purchaser, is not notice to others who become tenants in common with him by the same purchase.

———————————————————

(1) This case should have been reported in the third volume, but the papers did not come to the hands of the reporter in time, as the case was suspended upon a motion for rehearing, which was afterwards denied.

The term of the statute of limitation within which a bill must be filed to correct a mistake in a deed, is ten years; and the term commences at the delivery of the defective deed.

Though the statute was not in existence at the time the cause for filing the bill accrued, yet, if a sufficient and reasonable portion of the term of limitation within which the bill may be filed, remains after the enactment of the statute, it must be filed within the prescribed term.

To avail himself of the statute of limitations in equity, the party must, in some manner, set it up as a defence, in his pleadings, otherwise it will not be noticed.

THE appellant filed his bill in the Milwaukee Circuit Court, in equity, January 10, 1851, against Charles I. Kane, James S. Brown, John H. Tweedy, Peter Martineau, and George Dunbar, Mary A. Dunbar and Caroline E. Dunbar, infant heirs of William E. Dunbar, deceased, Bela Shaw and Rebecca Shaw, his wife, Carl Becman and Richard Montague, setting forth in said bill, in substance, that in the year 1835, said Montague made an agreement with Wm. E. Dunbar, since deceased, by which Montague agreed with Dunbar to furnish him money to purchase all of the northeast quarter of section 21, town 7, range 22, lying east of the Milwaukee River in the Milwaukee land district; and said Dunbar agreed to purchase said land; and that Montague and Dunbar should own the land as tenants in common, Dunbar agreeing to repay to him one-half of the money by him advanced. That, in pursuance of such agreement, Montague advanced the money, and Dunbar purchased the land of the United States, and conveyed an undivided one-half of all that part of said quarter section lying east of the Milwaukee River, to Montague, by deed duly executed and delivered in 1836.

That in the year 1837, Montague sold to Wm. E. Dunbar, then living, one-fourth of all said land, being one-half of his interest therein, and instead of taking a deed from Montague (the deed of Dunbar to Montague not having been recorded), it was given up and destroyed, and a new deed taken from Dunbar of what was by him represented to be, and by Montague believed to be, an undivided one-fourth of said land, which was described in said last deed as "An equal undivided fourth part of lots one and six, being that part of the northeast quarter of section 21, town 7, range 22 east, lying east of the Milwaukee river."

That the said southwest quarter of said northeast quarter lies east of said river, and that in drawing said deed there was a mis-

take in not inserting therein an undivided one-fourth of the southwest quarter of said northeast quarter. And that if the title to an undivided one-fourth of all said quarter section east of said river did not, by the deed last aforesaid, pass to said Montague, it did by the former deed of one-half of said land, and said Montague had by the former deed the legal title to one-fourth of all said land. The latter deed was recorded in the Milwaukee county register's office in 1837.

That on the 13th day of January, 1838, said Montague and wife conveyed by warranty deed, to John P. Chapin, his heirs and assigns, an undivided sixteenth of all said quarter section lying east of the Milwaukee River, described as lot one, and the south half of said quarter section; which deed was recorded in the proper office immediately thereafter. And on the 16th day of May, 1841, said Chapin and wife conveyed said undivided sixteenth of said quarter section, lying east of said river, to said Parker, which deed was recorded the same month.

The said Montague, by deed, dated October 27, 1842, conveyed to Phineas Fisk, his heirs and assigns, a part of said land described in said deed as follows: "An undivided three-sixteenths of lots one and six, being that part of the northeast quarter of section 21, town 7, range 22 east, lying east of the Milwaukee River."

That said Fisk purchased an undivided three-sixteenths of all said quarter section lying east of said river, and it was understood by and between said Fisk and Montague, at the time said deed was executed and delivered, that there was conveyed by said deed to Fisk an undivided three-sixteenths of all said quarter section lying east of said river. And if said deed does not convey an undivided three-sixteenths of all said quarter section lying east of said river, then there was a mistake in the description of said land in said deed, which was recorded in the proper office in the year 1842.

That previous to the 3d day of May, 1848, Phineas Fisk departed this life, leaving four children his sole heirs, to wit, Mary H. Edwards, wife of Thomas M. Edwards, Julia Densmore, wife of William Densmore, and Francis S. and Phineas S. Fisk.

That on the 3d day of May, 1848, Phineas S. Fisk, one of the heirs of Phineas Fisk, deceased, conveyed to Thomas M. Ed-

wards, his heirs and assigns, by deed bearing date on the day last aforesaid, an interest in said land described as follows : "An undivided one-fourth of three undivided sixteenths of lots one and six, being that part of the northeast quarter of section 21, town 7, range 22, lying east of the Milwaukee River." And said Fisk agreed to convey, and intended by said deed to convey, to said Edwards, one-quarter of three-sixteenths of all that part of said quarter section lying east of said river.

That on the 11th day of November, 1850, said Thomas M. Edwards and Mary, his wife, in his and her right, said William Densmore and Julia, his wife, in her right, and said Francis S. Fisk sold and conveyed unto said Parker, in due form of law, all their right, title and interest, claim or demand, of, in and to three undivided sixteenth parts of the west half of the south half of the northeast quarter of said section twenty-one.

That said complainant has good title, either legal or equitable, under the conveyances aforesaid, to one undivided fourth part of the west half of the south half of said northeast quarter section.

That said William E. Dunbar departed this life in 1846, leaving said George Dunbar, Mary A. Dunbar and Caroline E. Dunbar, infant children, his sole heirs, and Rebecca Dunbar, his widow, who has since intermarried with said Bela Shaw, who resides in the state of Illinois, and has taken out letters of administration on the estate of said Wm. E. Dunbar, deceased, in Illinois.

That said Martineau has been, as your orator is informed, believes and charges, appointed by the Circuit Court for the county of Milwaukee, special guardian of said infant heirs of Wm. E. Dunbar, deceased, and, as such guardian, has sold and conveyed, or pretended to sell and convey, all the interest of said heirs of said Wm. E. Dunbar, deceased, of, in and to said land ; that he has sold, or pretended to sell, a part of their interest at two several times, and at the last sale sold and conveyed to said Kane an undivided one-fourth of the west half of the south half of the northeast quarter of said section twenty-one, being the same undivided one-fourth of said last-mentioned land, which your orator claims by virtue of the conveyances and agreements herein mentioned.

That said Martineau, and those claiming under such sale, claim that no interest whatever ever passed from said Dunbar, deceased, to said Montague, or those claiming under him, in the southwest quarter of the northeast quarter of said section; and that neither said Montague, or those claiming under him, had or have any interest therein. Whereas your orator charges the contrary.

· That said Kane either purchased said land of such guardian, in his name, for himself, said Tweedy, Brown and Becman, or has since conveyed some interest in the same to his co-defendants, Tweedy, Brown and Becman. That said Martineau, before he made such sale as guardian, had notice and information that said Montague, and those claiming under him, claimed as their own an equal undivided one-fourth part of said southwest quarter of said northeast quarter section. And said Tweedy, Brown, Kane and Becman had each at the time they respectively purchased a part thereof, or an interest in said land claimed as aforesaid by your orator, notice, information and knowledge of the claim, right, title and interest of your oratort herein, and of those claiming under said Montague.

That said Martineau has now in his hands a large sum of money, to wit, $400, which he holds in his capacity of guardian of said infants, the same being the proceeds of the sale of the lands sold by him as guardian and claimed by your orator.

That one-fourth of said southwest quarter of said northeast quarter section is worth $4,000.

That said Tweedy, Kane and Brown have commenced a suit in chancery for the partition of said land claimed by your orator against him and others.

The bill waived an answer on oath from all the defendants except Tweedy and Martineau; and prayed that said defendants, except Martineau, might be compelled to convey unto said Parker, by deed in due form of law, with apt and proper words, the undivided one-fourth of said southwest quarter of said northeast quarter section. And if necessary, that the deeds aforesaid of said Dunbar to Montague, and of Montague to Fisk, may be so altered and corrected as to be made in accordance with the intention and agreement of and between the parties respectively at the time said deeds were executed.

And in case the sale of said land and conveyance thereof by said Martineau as guardian, passed a good and valid title to said lands, as against said Parker, and those claiming under said Dunbar, deceased, and said Montague, then said Parker prayed for a personal decree against said Martineau for the amount of the proceeds of such sale; also against the heirs of said William E. Dunbar, deceased, for all the moneys, proceeds of said land, which had come to their hands; that said partition suit and this be heard together. And there was the further prayer for general and equitable relief, process, &c.

The complainant amended his bill, and stated in the amended bill, that Martineau, at the commencement of the suit, had in his hands, as administrator of the estate of said William E. Dunbar, deceased, demands to a large amount due him in his character as administrator, and given for the sale and conveyance by him, as such administrator, of the interest of which said Dunbar died seized in said quarter section of land mentioned in the original bill, other than that portion of said land in dispute in this suit; and that said Martineau also had money in his hands belonging to the estate of said William E. Dunbar, deceased, or his heirs, to the amount of $600; and that said Dunbar had then in his hands money to the amount of $500 belonging to said infant heirs of said William E. Dunbar, deceased.

The bill was taken as confessed as to Rebecca and Bela Shaw, after notice by advertisement to them and the infant heirs. All the other defendants, except the infants, were personally served with process.

A guardian *ad litem* was appointed for the infants, and they put in the usual answer by their guardian.

Richard Montague answered, admitting the statements in the bill, and also stating that he had made, after the commencement of the suit, a quit-claim deed of the premises in dispute, to the complainant, which deed was filed as evidence in the cause.

The defendant Carl Becman answered the bill in substance, denying notice of any claim or interest in the land of Montague or those claiming under him, and asserting that he bought one-eighth of the disputed premises of Kane, Tweedy and Brown, and that he was an innocent *bona fide* purchaser.

Tweedy answered, admitting the purchase of that part of said

quarter section east of the Milwaukee River, by Dunbar, of the United States; that Martineau, as guardian for said infants, sold and conveyed the premises in dispute, to wit, the undivided one-fourth of the southwest quarter of said northeast quarter, being ten acres (having previously sold one undivided half of said southwest quarter, as administrator), unto Charles I. Kane; that he and his co-defendants, Kane, Brown and Becman were equally interested in such purchase, and furnished equal shares of the purchase money, and that he still owned an equal fourth part of the land so purchased by said Kane, as tenant in common, and received from Kane a conveyance thereof. As to notice of the title of Montague, or those claiming under him, he says:

That he purchased his said interest in said premises believing the same to have been the property of the estate of said Dunbar, deceased, and paid a full and valuable consideration, to wit, about the sum of sixty dollars per acre.

That before said purchase he examined into the title of said premises, &c.—for that purpose applied to Thomas L. Ogden, Esq., counselor at law at Milwaukee, who read to this defendant an abstract of the records of the several conveyances, affecting the title of the estate of said Dunbar, deceased, to said premises. That said Ogden informed defendant that the title of three-fourths of the said southwest quarter of said northeast quarter of said section 21, was, as appeared by the records, in the said Dunbar, at his decease.

Defendant thinks, that about the same time he himself examined the records of the register of deeds, in order to satisfy himself as to the title and quantity of land in said premises, belonging to the estate of said Dunbar; that he cannot recollect how far his examination extended, nor whether he did or did not examine the records of the several conveyances recited in said bill of complaint, under which complainant and others claim title to the premises in dispute; but defendant thinks that he read the record of the deed from Dunbar to one Richard Montague mentioned in said bill, and that he noticed the description in the deed; defendant has some recollection that Mr. Ogden called his attention to the language of that description, with the remark that he had once made an abstract of the title of the said premises originally entered by Dunbar for Mr. Crocker and Mr. Hath-

away, who represented some of the owners; that the abstract showed a less interest in those claiming under Montague, than he or they supposed them to be entitled to, and that Mr. Hathaway suggested that there might be a mistake in the description of the deed of Dunbar to Montague; and this defendant saith that at the time he became interested in the premises in dispute, he had no other notice, information or knowledge as to the legal or equitable title or claim of the complainants, and others claiming under Montague, than as hereinbefore stated; that he knew nothing of the record deeds set forth in complainant's bill, under which complainants and others claim, save such knowledge as he derived from Mr. Ogden's abstract and a hasty examination of the records.

That from such examination he satisfied himself that the title of three-fourths of the said southwest quarter of the northeast quarter of said section 21, was in said Dunbar at his decease; that previous to his purchase of his interest in said premises, he made particular inquiry of one Mr. Marsh, the attorney and agent of said Rebecca and Bela Shaw, whether there was any mistake in the description in the said deed from Dunbar to said Montague, and whether any person claiming under Montague, had any valid equitable claim to the premises in dispute in this cause; that said Marsh assured defendant to the contrary, and that the title in Dunbar's heirs was perfect. Defendant further saith that on the 28th day of October, 1848, the said three-fourths of said southwest quarter of said northeast quarter of said section 21, and also the half of said lots one and two, were sold on execution as the property of said Dunbar; and that such sale was known to the agent of said complainant, and others claiming under said mortgage; and that neither said complainant or any others claiming under said Montague, nor their agent, nor any person to the knowledge or information of this defendant, had taken any steps to prevent or forbid the sale under said execution, or the said sale by the said Martineau, as special guardian of said infants, nor to forbid or prevent the payment of the purchase money for said premises, neither have they commenced any writ or proceedings to establish their claim or title to the premises in dispute, until the filing of said bill of complaint; that this defendant, some time after the purchase of the interest of the heirs of said

Parker vs. Kane et al.

Dunbar, had several conversations with said Joshua Hathaway, representing himself to be the agent of persons claiming under Montague; and although said Hathaway stated reasons for supposing there had been a mistake in the description contained in the said deed of Dunbar to Montague, he never, when particularly inquired of by this defendant, communicated to defendant any of the facts set forth in said bill of complaint as to the original agreement between said Dunbar and Montague,—the advance of the purchase money, the first conveyance, the destruction thereof, the subsequent agreement, and the mistake in the deed which was recorded; and the defendant believed, from said conversations with said Hathaway, and a subsequent conversation held by him with the complainant, whom he met for the first time at Milwaukee, that the facts set forth in said bill, concerning the nature of the transaction between said Dunbar and Montague, were never communicated to said Hathaway, or to complainant, or to any persons representing at Milwaukee the complainant and others claiming under said Montague.

And this defendant further saith that, except as hereinbefore set forth, he had not, at the time of the said purchase of the premises in dispute, any notice or information as to the claim of said complainant and others, to his recollection and belief; but defendant admits that it is not improbable that he may have had conversations on the subject which have escaped his recollection.

And this defendant insists that the purchase made, as hereinbefore stated, by said Kane, of the premises in dispute, was *bona fide* and lawful; and that said Kane, by virtue of said conveyance made by said infants, became lawfully seized of said premises; and that this defendant, by virtue of said conveyance to him from said Kane, has become the lawful owner of one-fourth of said premises.

And this defendant submits that his purchase of interest in said premises was made without any knowledge or notice of any claim in complainants or others, sufficient to put him on inquiry or raise a reasonable suspicion. That his examination of the title, and inquiry of the counsel of Bela and Rebecca Shaw, and their children, was sufficient to remove such suspicion. That the silence of complainant and others for so long a time, their neglect

to assert their claim, after information of the execution sale of the premises, and of the defect of the legal title, or to furnish any evidence, information or notice of the facts upon which their pretended claim is grounded, were sufficient to discredit the claim in the mind of a prudent man, and ought in equity to bar them from maintaining their cause against this defendant.

The defendant Kane answers, and says, in substance, that he was a joint purchaser of the premises in dispute at said guardian's sale with his co-defendants, Brown, Tweedy and Becman,—denies all notice of any claim of the complainant, or of those claiming under Montague, to said premises,—denies that said complainant has any valid or legal interest in said premises,—alleges that he is a purchaser in good faith and for a valuable consideration, to wit, $60 per acre. And he further alleges "That the mistake, if any, in the deed of Dunbar to Montague, was made more than ten years before the commencement of this suit, and he claims the benefit of any saving statute of limitations of Wisconsin in the same manner as if the same were pleaded."

The defendant Brown sets up in his answer, that before the commencement of this suit he had conveyed his interest in the premises to Charles I. Kane, and disclaims any interest therein.

Peter Martineau answers, and says that he had no knowledge of the complainant's claim to said land, or of those claiming under Montague, before reading the bill of complaint in this cause. He admits he sold, as guardian, the land in dispute for $602.50, of which he then had in his hands about the sum of $200. He also admits that before the guardian's sale, he had sold land belonging to the estate of William E. Dunbar, as administrator, but nowhere states, except vaguely as above-mentioned, the amount in his hands as guardian or administrator.

During the pendency of the suit, Becman died, and by stipulation, a supplementary bill was filed, stating his death, and that David H. Waldo had, during the pendency of this suit and before his death, purchased of him his interest in said premises.

Waldo answered, admitting the statement in the supplementary bill, and denying notice of the complainant's claim, either to Becman or himself, and plead that Becman was an innocent purchaser, in good faith, for a valuable consideration. And also claimed the benefit of the statute of limitations.

Parker vs. Kane et al.

Replications were put in to all the answers, and testimony taken.

The several deeds and conveyances mentioned in the bill, were filed as evidence, or a transcript from the records properly certified by the register of deeds of Milwaukee county, and it was admitted by stipulation that the persons named in the bill as heirs of Thomas Fiske, deceased, were his sole heirs at law.

Leave having been given to take the deposition of Richard Montague, the complainant and John P. Chapin first released him [a copy of the release is attached to his deposition, and by stipulation was to be considered the same as though it was the original,] from the covenants in his deed to Chapin, dated January 13, 1838, of the one undivided sixteenth of that part of said quarter section, lying east of the Milwaukee River.

The testimony taken and produced at the hearing was quite voluminous, but its substance and effect is adequately set forth in the opinion of the court, and need not be stated here.

The complainant's bill was dismissed in the Circuit Court with costs, from which decree the complainant appealed.

*I. Downer*, for the complainant.

*Waldo & Ody* and *Brown & Ogden*, for the defendants.

*By the Court*, CRAWFORD, J. The disposition of this case demands that we shall discuss only a few of the points made and insisted upon by counsel in the argument.

The first question to be noticed, has reference to the original transaction between Dunbar and Montague. The former executed and delivered to the latter a deed of conveyance of the undivided one-half of certain lands, now embraced in the limits of the city of Milwaukee; and after the making of this deed, Dunbar purchased from Montague an undivided one-half of the interest in the lands which he had previously conveyed to Montague. The deed from Dunbar to Montague not having been recorded, as the statute upon the subject of conveyances of real estate required, it was agreed between them that this deed should be returned to Dunbar and destroyed, and that a deed of an undivided *one-fourth* of the lands should be executed and delivered

by Dunbar to Montague, which was done, and the first deed was accordingly returned and destroyed.

There is no doubt in our minds that the cancelation or destruction of a deed of conveyance of lands, by the consent and agreement of the parties to it, cannot operate to revest the title in the grantor. The execution and delivery of a deed of conveyance of these lands, as between the grantor and grantee, vested the estate in the latter; but the voluntary destruction of the instrument by the consent of the parties, could not pass the estate back again, because the transmission of title to real estate, at the time of the original transaction, could only be by deed of conveyance in writing. The mere act of destroying the evidence of the title in Montague, could not disturb the title itself, and so far as Dunbar was concerned, it was fully vested in his grantee. The general current of authority, English and American, sustains this view of the question. *Vide Roe ex dem. Berkley vs. The Archbishop of York,* 6 *East,* 86; *Bolton vs. Carlish,* 2 *H. Black.* 259; *Doe vs. Hirst,* 3 *Stark. N. P.* 60; *Gilb. Ev.* 110, *and notis; Doe vs. Bingham,* 5 *B. & A.* 677; *Jackson vs. Chase,* 2 *John.* 84; *Lewis vs. Payne,* 8 *Cow.* 71; *Jackson vs. Gould,* 7 *Wend.* 364; *Raynor vs. Wilson,* 6 *Hill,* 469; *Botsford vs. Morehouse,* 4 *Conn.* 550; *Gilbert vs. Bulkley,* 5 *Conn.* 262; *Marshall vs. Fisk,* 6 *Mass.* 24; *Chessman vs. Whittemore,* 23 *Pick.* 231.

But although the estate remains in the grantee as against the grantor, notwithstanding the voluntary destruction of the deed, yet we see no means by which, in view of the statute of frauds, and the rule of evidence created by that statute, the grantee in a deed of lands who has voluntarily and without fraud or mistake, destroyed his deed, can establish or prove his title.

It is not like the cases of the loss of an instrument, or its destruction by accident or mistake, in either of which cases secondary evidence would be admissible, but it is an attempt to supply the place of written evidence of the transmutation of real estate, as required by the statute of frauds, by parol proof of the contents of a deed, which the party had, by his own act, voluntarily destroyed. In such a case he is not at liberty to subvert the rule of evidence, and by his own volition, having placed the higher grade of proof beyond reach, insist that he is therefore entitled to introduce an inferior grade of proof which

the statute interdicts. *Vide Farrar vs. Farrar,* 4 *New Hamp. R.* 191.

But it is unnecessary to pursue this branch of the subject, in-asmuch as we view the case of the complainant, as made out by the pleadings and proofs, entirely based upon a mistake committed in the description contained in the deed from Dun-bar to Montague, dated December 18, 1837, and not at all af-fected by the cancelation of the prior deed.

The next question which has occupied our attention, is whether there is sufficient evidence of such a mistake in the second deed of Dunbar to Montague, bearing date December 18, 1837, and in the deed of Montague to Phineas Fisk, bearing date October 27, 1842, as the present complainant claiming under and through these conveyances, may invoke a court of equity to correct. As a part of the proofs in this case, the deposition of the defendant Montague was taken and read in evidence subject to exceptions, and in order to render him competent as a witness, a release un-der the hands and seals of the complainant (Joel Parker), and one John P. Chapin, was produced and filed. The case shows that on the 13th day of January, 1838, Montague and his wife conveyed by a warranty deed, to John P. Chapin, his heirs and assigns, an undivided sixteenth part of certain lands, includ-ing the tract now in controversey, which deed was duly recorded; and that on the 18th day of May, 1841, the said Chapin and his wife conveyed the same interest to the complainant, and the last-named conveyance was likewise recorded. It also appears that Montague, by deed containing the usual covenants of seizin and general warranty, and bearing date the 27th day of October, 1842, conveyed to Phineas Fisk, his heirs and assigns, "an un-divided three-sixteenths of lots one and six, *being that part of the northeast quarter of section* 21, *town* 7, *range* 22 *east, lying east of the Milwaukee River,*" and by divers *mesne* conveyances from the several heirs of Phineas Fisk, the last-mentioned interest so far as it embraced the southwest quarter of the quarter section, became vested in the complainant. The above-described quar-ter section of land is situated partly on the east side of the Mil-waukee River, and partly on the west side of the same, but the lots numbered one and six, particularly described in the deed from Montague to Fisk, do not embrace *the whole of that part of*

*the quarter section lying east of the river,* there being the southwest quarter of said quarter section, also on the east side of the river, the one-fourth of which last-mentioned tract is now in dispute. By the release from Parker and Chapin, we find that Montague was discharged from all claim and demand which either Parker or Chapin had or might have against him by reason of any breach of the covenants contained in his deed to Chapin, bearing date January 13, 1838.

This release, so far as Chapin was concerned, unquestionably discharged Montague from all liability ; but it is not quite so apparent that it would have a like effect in view of Montague's covenants in his deed to Phineas Fisk of three-sixteenths of the property which, by subsequent conveyances by the heirs of Fisk to Parker, would enure to the benefit of the latter, and might be pursued in him in case of a breach of any of the covenants. But, however this may be, it is clear that in no event could Montague be held liable by reason of a decree in this cause either granting or refusing the relief prayed. If the relief were granted, and the mistake in the description of the property corrected, there would be no injury suffered by the persons claiming under Montague, for which they or any of them could maintain an action against him on his covenants to Fisk; while on the other hand, if the relief were denied, his deed to Fisk would remain unchanged, and he would not be liable, because no *parol* proof could be introduced to extend the covenants in his deed to any other lands than those described in the deed, and there is no pretence that so far as the lots described in that deed are concerned, any violation of Montague's covenants has taken place. His deposition was, therefore, proper evidence in the case. The material equities of the complainant's bill are adequately proved by the testimony of Montague, Milton Kilbourn, Joshua Hathaway and Benjamin F. Adams, and by the deeds of conveyance. No element of fraud on the part of Dunbar is observable, but the proofs show that when Dunbar had conveyed one-fourth of that part of the quarter section lying east of the river, to Oliver Holman, and had executed the second deed to Montague (in which the complainant claims that a mistake in the description was made), he considered that only one-half of the whole property belonged to him. It is needless, in the present condition of

the case, to animadvert upon the proofs on this branch of the case.

The next inquiry relates to the evidence of notice or information of the condition of the title brought home to the defendant John H. Tweedy.

In his answer, this defendant says that he read the record of the deed, from Dunbar to Montague, mentioned in the bill, and that he noticed the description in the deed, "that he has some recollection that Mr. Ogden called his attention to the language of that description, with the remark that he had once made an abstract of the title of the said premises, originally entered by Dunbar, for Mr. Crocker and Mr. Hathaway, who represented some of the owners; that the abstract showed a less interest in those claiming under Montague, than he or they supposed them to be entitled to, and that Mr. Hathaway suggested that there might be a mistake in the description of the deed of Dunbar to Montague." These conversations were had before the purchase by Kane in which Tweedy acquired his interest. And again he says in his answer: "And this defendant further saith, that except as hereinbefore set forth, he had not, at the time of the said purchase of the premises in dispute, any notice or information as to the claim of said complainant and others, to his recollection and belief; but defendant admits that it is not improbable that he may have had conversations on the subject, which have escaped his recollection." The testimony of Joshua Hathaway and Thomas L. Ogden, shows that Mr. Tweedy was, in conversations with each of these witnesses, informed that there was a claim to a portion of the land now in dispute, on the part of Mr. Parker and others, and that they paid the taxes upon the further interest so claimed. Mr. Hathaway swears that he is confident that he stated in the conversation, that "it was through the contradictory description contained in one of Dunbar's former deeds," and thinks he said the further interest claimed by the parties he represented, "would have to be adjudicated;" and Mr. Ogden swears, "I think I told Tweedy I should think there had been a mistake either in the deed of Dunbar to Montague, or Montague to Chapin."

This, we think, was notice to Tweedy, fully calculated to apprise him that the title to the property which he was about to

purchase, was in dispute, and to put him upon inquiry. The records of the different deeds concerning this property, were within his reach, and from them he could learn, and did learn, that a discrepancy and mistake existed in the title—the agent of the complainant, and of others claiming under deeds purporting to give them an interest in the tract in dispute; and the attorney with whom he conversed, having directed his attention to the adverse or conflicting claim.

Sir Edward Sugden, in his work on *Vendors and Purchasers* (*Vol. II, p.* 290), says: " What is sufficient to put a purchaser upon an inquiry, is good notice; that is, where a man has sufficient information to lead him to a fact, he shall be deemed conusant to it." In *Strong and wife vs. Arden and others* (1 *John. Ch.* 261), Chancellor Kent, in speaking of a purchase by one of the defendants, says: " I shall also consider him as a purchaser, without actual notice of the settlement upon the plaintiff. He declares in his answer that he had no knowledge or notice of the conveyance of 1805, when he purchased, and there is no proof to contradict this answer. But I hold him chargeable with constructive notice, or notice in law, because he had information sufficient to put him upon inquiry. He admits that, before the execution of the deed, he had heard that the grantor had made some provision for his daughters out of the property in *Greenwich* street; and there is no evidence in the case that the grantor owned any other property in that street, except the lots included in the settlement." Chancellor Walworth, in *Tuttle vs. Jackson* (6 *Wend.* 213), says: " Whatever is sufficient to make it his (the purchaser's) duty to inquire as to the rights of others, is considered legal notice to him of those rights."

It is true, that mere rumor or suspicion of a defect in the title, or an outstanding interest in a third person, would not be sufficient to operate as constructive notice; but where land is claimed under a deed, the grantee in which openly and notoriously affects to control it as his property, and pays the taxes assessed upon it, we can esteem this no less sufficient to put a purchaser upon inquiry, than if the land were in the possession of a tenant or any third person who might claim as a purchaser under an unrecorded deed. We must, therefore, consider Tweedy chargeable with notice in law, of an outstanding claim or interest in

the complainant, in the same manner that Dunbar's heirs would have been, from whose guardian he acquired title.

But, although Tweedy is thus held, we are not disposed to consider that the notice to him would affect those who became tenants in common with him by virtue of Kane's purchase. Kane was the purchaser at the guardian's sale, for the benefit of himself, Tweedy, Becman and Brown, and the property was conveyed to Kane by Martineau, the guardian, under the direction of the Circuit Court of Milwaukee county. Afterwards Kane conveyed three-fourths (undivided) to Tweedy, Becman and Brown, and thereupon they all became tenants in common. The notice to Tweedy, one of the tenants in common, was not notice to his co-tenants. *Vide Wiswall and Price vs. McGown and others*, 2 *Barb. S. C.* 270; *Snyder vs. Sponable*, 1 *Hill*, 567.

We find that before the commencement of this suit, the defendant James S. Brown had sold and conveyed all of his interest in the property to another of the defendants, Charles I. Kane, and by his answer, Brown disclaims all title, so that he must be dismissed from the case. Another of the original defendants in this cause, Carl Becman, died after the filing of the bill, and by a supplementary bill, David H. Waldo, a purchaser from Becman, *pendente lite*, was made a defendant.

The defendants Kane and Waldo, severally rely and insist upon the lapse of time as a defence under the statutes of Wisconsin, as well as under the rule which prevails in courts of equity, in analogy to the rules of the courts of law. Section 40 of the act concerning the time of commencing actions, contained in the Revised Statutes of Wisconsin territory, provides that "Bills for relief, in case of the existence of a trust, not cognizable by the courts of common law, *and in all other cases not herein provided for*, shall be filed within ten years after the cause thereof shall accrue, and not after."

The cause or matter of complaint, to relieve him from which the complainant filed his bill in this case, originated in a mistake committed in the descriptive part of a deed, executed on the 18th day of December, 1837, and immediately after the execution and delivery of that deed to Montague, and those who might claim under him had a right to file a bill in chancery to correct the mistake so made. The *cause* for such a bill had *accrued* and was

complete upon the delivery of the defective deed, and although at the time of its execution and delivery, the statute of limitations above cited was not enacted, yet after the passing of the act, and after it went into operation, a sufficient and reasonable portion of the period of limitation was still unexpired within which a bill might have been filed by the party entitled to file it. In such a case the territorial act was applicable, and it was essential, in order to avoid the operation of the act, that the bill should be filed within ten years after the making of the deed in 1837. This construction in no way trenches upon any constitutional provision. It is the province of the legislature to prescribe the manner and time in which remedies shall be pursued in our courts, provided some remedy be given, and some reasonable time be provided within which such remedy may be sought, and in this case ample opportunity was afforded to Montague or his assigns to apply for relief. From the time when the act of limitation took effect (July 4, 1839), until the death of Dunbar in 1840, abundant time was afforded to Montague, and those claiming through him, to apply for relief, but they neglected to do so, and we think the bar created by the statute may be successfully interposed in this case. The view which we have here taken of the operation of the territorial act will be found to be sustained by the following cases: *Spoor vs. Wells*, 3 *Barb. Ch. Rep.* 199; *Sayre vs. Wisner*, 8 *Wend.* 661; *The People vs. Supervisors, &c.*, 10 *Wend.* 363; *Lewis vs. Lewis*, 7 *How.* 776; *Story's Conflict Laws*, §§ 576 to 580; *McElmoque vs. Cohen*, 13 *Pet. Rep.* 312; *Smith vs. Morrison*, 22 *Pick.* 430.

This cause was instituted on the 10th day of January, 1851, long before which time the limitation of the statute had created a bar to the matters complained of in the present case, in favor of such of the defendants as chose to avail themselves of its protection by claiming its benefits by plea or answer.

We have already seen that Tweedy, having had constructive notice, must be held to respond to the equities of the complainant, and as he has not shielded himself by the statute of limitations, he cannot receive its protection. In like manner the defendant Martineau, as the guardian of the heirs of Dunbar, having moneys, the proceeds of the sale of the property in question, in his hands, which he admits by his answer, without relying

upon lapse of time as a defence, must be held to account to the complainant for the proceeds in his hands at the time of the filing of the bill.

A question of some moment was raised in argument, relating to the principle of *caveat emptor*, as applicable to judicial sales; but the views which we have taken above preclude the necessity of discussing this question.

From an examination of the whole case, we believe that the decree of the Circuit Court, so far as it relates to the defendants Charles I. Kane, David H. Waldo and James S. Brown, ought to be affirmed, with costs to said defendants, and, so far as it relates to all of the other defendants, the said decree ought to be reversed, with costs to the complainant, and the cause remanded for further proceedings.