## WICKES VS. LAKE and another, impleaded, etc

1. Where P., being the equitable owner of sixty acres of land, of which three-fourths of an acre had been cleared and fenced, left it in charge of a person living on an adjoining tract, who chopped wood upon it and cultivated the clearing, the land being in a densely timbered and sparsely settled country, and the neighbors generally understanding that it belonged to P.: *Held*, that this was such a possession as constituted notice of P.'s right to one who took a mortgage from the holder of the legal title.

2. In a foreclosure of the mortgage, P. having set up his title, and prayed for a decree that the mortgage be released as against him, and the claim having been litigated, it was not error to grant such relief.

## *Per* DIXON, C. J., *dissenting* :

1. The possession was *vacant*, and was insufficient to put the mortgagee upon inquiry.

2. The rule " that possession, to be notice, must be open, visible, exclusive and unambiguous, not liable to be misunderstood or misconstrued," requires that it should be thus clearly marked and distinguished as *the possession of the party claiming adversely*, and *not* that of the party having the legal title of record. It must be *inconsistent* with the possession, and presumed right of possession, which follow the legal title, and which appear to be in the party having such title of record. *Ely v. Wilcox* (20 Wis. 523), commented upon, and the facts explained.

3. If the *apparent* possession of land is *consistent* with the title appearing of record, it is not the duty of the purchaser to make any inquiry concerning the title beyond what the recording office shows.

4. It is only upon the premises themselves, and of persons found there at the time of purchase, that the purchaser is bound to inquire. Some probable exceptions to this rule noted.

5. Where neighborhood reports or understanding as to an adverse title or claim are admissible in evidence to charge a mortgagee or purchaser for value with notice, it must be shown that he knew them, and the facts, or some of them, with respect to such reputed title or claim.

6. Whether, under our recording acts, the purchaser from the party having the title of record is in any case bound to go upon the land and ascertain, at his peril, that it is not adversely possessed, or, if it be so possessed, is conclusively presumed to know it, or whether it is not incumbent on the party in possession, and relying upon it, to show that the purchaser had *actual* knowledge of it, *quære*.

APPEAL from the Circuit Court for *Fond du Lac* County.

Foreclosure of mortgage of one hundred and sixty acres of land, executed February 7, 1854, by one Eliza McCune to the Milwaukee & Horicon Railway Company, and subsequently, before due, negotiated to the plaintiff.

In 1849, Jane McCune, owning a warrant for 160 acres of land, requested her brother, John McCune, to enter for her the land here in question; and he did enter it with said warrant, but in his own name. At the same time he entered in his own name an adjoining 160 acre tract, with a warrant belonging to Eliza McCune, who was also his sister, and had requested him to enter said tract for her. In 1851, Jane McCune sold and conveyed the tract in suit to one McWhorter, of whom the defendant *Lake* and one S. D. Palmer purchased and took deeds during that and the following year, the deed to *Lake* being for one hundred acres, and that to Palmer for sixty acres, of said tract. In 1852, John McCune undertook to convey to his sisters the tracts which he had purchased for them respectively, as above stated, but by mistake, not discovered by any one until 1858, he conveyed Jane's tract to Eliza, and that of the latter to Jane. When Eliza executed the mortgage in suit, she supposed that it covered the land originally entered for her.

*Lake* and *Palmer* each asked to have the plaintiff adjudged to release the mortgage as against his premises, on the ground that he was the equitable owner in possession at the time the mortgage was made and when it was negotiated to the plaintiff, and that the mortgagee and the plaintiff were chargeable with notice of his rights. That their possession at the time of the assignment to the plaintiff was sufficient, does not seem to have been disputed; and the only important question was, whether there was such a possession as to charge the railroad company when it received the mortgage.

The evidence tended to show that *Lake* went on to the land claimed by him in December, 1851, and cleared up about two and a half acres between that time and March, 1852; that he then left it, and did not return until March, 1855, being out of the state most of the time. *Lake* himself testified: "When I went off in the spring of 1852, I let the land, by parol, to Mr. Blackwood until I returned. He was to use the three-quarters of an acre that was fenced, and was to clear what I had chopped, and was to have timber off the place; and he took timber off of it to build a barn. On my return, I found him in possession of the premises; he had fences on them, and his cattle pasturing there. More than half the farmers had fences of the same kind. He gave up the possession of the premises to me, and I remained there. * * There was no house on the land when I returned, and no one living there." It appears that Blackwood owned land immediately adjoining that of *Lake*, and there was a division fence between them, made of logs. Blackwood testified: "When I came here in 1849, there was about one-half an acre cleared for cultivation, and one-half an acre chopped, on this land which is claimed by *Lake*, and there was a fence around the clearing. In 1851, *Lake* chopped perhaps a couple of acres, cut some logs for a shanty, and split rails for a fence on his land. This clearing came up to the road from Oshkosh to Hortonia. * * *Lake* left this land in my care when he went away in the spring of 1852. * * I inclosed nearly the whole land with a brush fence,* and kept my cattle on it. I kept the fences in repair about the clearing, and raised potatoes on it. I took some firewood and cut some hewing sticks for a barn frame on this land. I had possession until *Lake* came back in 1855. I cropped the clearing every year, and kept my cattle on the land. * * Previous

---

* This seems to refer to the fence described in the text, by another witness, as a "tree fence," which was not built until *after* the date of the mortgage in suit.

to 1854 this land was partly inclosed by my fence on one side and the mill pond on the other.   *   *   The country in and around Hortonia was heavily timbered in 1854.   It was new, and there was but little clearing on any of the farms.   There were only a few acres under cultivation in the· town.   This farm of *Lake's* was used about the same as other farms in that town, except, perhaps, that others had a few more acres cultivated.   The indications of actual occupancy and ownership of this land were about the same as on other farms in that town."   Another witness testified : "In 1849 there was a small clearing on this land [claimed by *Lake*], three-fourths of an acre or more.   This clearing was on the only road we had south from here to Oshkosh at that time, and came clear up to the road.   *Lake* chopped adjoining this clearing and in sight of the road.   *   * When Blackwood was in possession of the land, there was a log fence built between him and *Lake ;* there was also a fence around the clearing on the place. . The fence built by Blackwood, and the mill pond, inclosed nearly all of *Lake's* land ; so that, after the fence was built, Blackwood used nearly the whole of the tract for a pasture."

Another witness testified that he came to said town of Hortonia in October, 1853, and first became acquainted with the tract claimed by *Lake*, he thought, in February, 1854.   "Blackwood then came to me and said that tract of land was left in his care by *Lake*, and that if I would help him fence it we would occupy it together as pasture land.   We fenced it the latter part of February and the fore part of March, perhaps, 1854.   We made a tree fence, so that, with Blackwood's fence and the mill pond, it was nearly all inclosed.   *   *   The next summer we used the whole land for pasture."   Several other witnesses testified to substantially the same facts.

As to the *notoriety* of Lake's claim of ownership, etc., one witness testified : "It was generally known here

in 1852 that *Lake* owned the land. There were but few inhabitants here then, and I think they all knew that the land was *Lake's*, because it was called *Lake's* land." Another said: "In the winter of 1851–2 *Lake* claimed to have bought the land and to be the owner of it. Ever since that winter or the following spring, the land has been in the actual occupancy of *Lake* or somebody." Another said: "It was generally known and understood around here that *Lake* had purchased and owned the land; from the winter of 1852 it went by the name of *Lake's* land." Several others testified in the same manner.

In reference to the occupancy of the sixty acres claimed by *Palmer*, the evidence was that a small tract, three-fourths of an acre or an acre, adjoining the public road, was cleared before 1851, and surrounded with a pole fence, and that one Thompson who lived on an adjoining tract, had charge of this land in 1853 and 1854, either as the agent or tenant of Silas Palmer. Thompson testifies: "I occupied the clearing on the Palmer tract during the season of 1853. * * Silas and *Edward Palmer* were at my house I should think in December, 1853. My son Henry went out hunting with them, and when he returned told me that Palmer wanted me to take charge of that tract and not let the timber be stolen; I then went on and cut some wood off of it. Kelsey came on in the spring, and I let him have the clearing to plant beans on. I worked with him on the place. I kept watch of the land until it was sold. We got wood off of it, and kept the pine timber from being stolen. It remained in my charge until 1855. * * I cultivated the clearing for two or three years, commencing with 1853. I had beans on it for the summer of 1853. * * No one lived on the land in 1854." Henry Thompson, son of the previous witness, testified to the same facts. The testimony of Mr. Kelsey, above mentioned, show that his occupancy of the clearing did not commence until several months

after the date of the mortgage in suit.   Silas D. Palmer
testified that in the spring of 1852 he rented the premises
to Thompson, who was already "in possession" of
them; and that from that time until witness sold the
premises to *Edward F. Palmer*, in 1857, Thompson
was "in the actual and continued possession" of them
as his tenant.   *Edward F. Palmer* also testified that in
1852 or 1853 he was present at an interview between his
brother Silas and Thompson, at which the land was
rented to the latter.   There was also testimony, similar
to that above recited in reference to the *Lake* tract, to
show that in 1852 and thereafter it was generally under-
stood in the neighborhood that this land belonged to
Silas D. Palmer.

The court found that, when the mortgage in suit was
made, the defendant *Lake* and the grantor of the defend-
ant *Palmer* were "in the open, visible, exclusive and
unambiguous possession" of the tracts claimed by them
respectively, and rendered judgment that the mortgage
be released as against them; and the plaintiff appealed.

*Hudd & Wigman*, for appellant, contended, 1. That a
title hostile to that of the mortgagor could not be adju-
dicated, though litigated, in this action.   The judgment
should have been so framed, perhaps, as to protect the
respondents from a writ of restitution in this action, dis-
missing it as to them; but it could not give affirmative
relief.   *Wickes v. Lake*, 21 Wis. 410; *Supervisors of
Iowa Co. v. Mineral Pt. R. R. Co.*, 24 id. 93.   2. Pur-
chaser for a valuable consideration, without notice, who
first puts his conveyance on record, is protected.   11
Met. 244; 3 Pick. 149; 17 Wis. 241; 20 id. 106; *Ely v.
Wilcox*, id. 523.   3. As to the nature of the possession
which constitutes notice to a purchaser, see *Butler v.
Stevens*, 26 Me. 484; *Bell v. Twilight*, 2 Foster, 500;
*Wright v. Wood*, 11 Harris, 130; *Martin v. Jackson*, 3
Casey, 504; *McMechen v. Griffing*, 3 Pick. 149; *Holmes*

*v. Stout*, 3 Green's Ch. 492; 2 Stockt. 419; *Patten v. Moore*, 32 N. H. 384.

*Duncan E. Cameron* (with *Geo. H. Myers*, of counsel), for respondents, contended that a purchaser, having notice or information sufficient to put him upon inquiry, if he fails to make such inquiry, is chargeable with notice of all he *might* have learned. Willard's Eq. 249; 1 Story's Eq. Jur. § 396; 5 N. H. 188; 32 id. 384; 8 id. 269; 1 Johns. Ch. 267, 299; 4 id. 46; 4 Mass. 639; 20 Wis. 523. As to the kind of possession which constitutes notice, they cited, also, *Poor v. Horton*, 15 Barb. 485; *Doolittle v. Tice*, 41 id. 183; *Stewart v. Mc-Sweeny*, 14 Wis. 468; 14 Wend. 239.

COLE, J. There would not seem to be any serious difficulty in affording proper relief to *Lake* and *Palmer* in this action, if it appears that they were the equitable owners of the mortgaged premises when the mortgage was executed, and had such possession as would operate as notice to the mortgagee or his assignee of their title. That there was a mistake in the description of the land in each of the conveyances executed by John McCune to his sisters is established by the most satisfactory evidence. The mortgaged premises embraced in the mortgage of Eliza should have been conveyed to Jane. She was really the owner of the land, John having entered it for her and as her agent. John, in violation of his trust, as it may fairly be assumed, entered the land in his own name, instead of that of his principals; and hence the mistake on his part. But he states that he deeded to Eliza the land entered for Jane, and his testimony is corroborated by all the evidence in the cause. This mistake, therefore, in the deed from John McCune to Jane McCune, having been established by the most conclusive evidence, there would not seem to be any valid objection to declaring the mortgage void as against the premises in question, unless the mortgagee or his assignee is entitled to protection as

a subsèquent purchaser for valuable consideration without notice of these equitable adverse claims. Was there, then, such possession of the premises, and such acts of ownership exercised over them by those claiming under Jane, as would amount to constructive notice of their rights to the subsequent mortgagee? We are inclined to think there was.

It appears that the land in controversy was situated in a new and heavily timbered country, where there were but few settlements. As early as 1849 or 1850, parties claiming under Jane McCune went into the actual possession of the land, and chopped and cleared small pieces on each tract now belonging to *Lake* and *Palmer*. In December, 1851, the defendant *Lake* bought a hundred acres of the land, took possession of the same, and commenced chopping and clearing it up. At the time, there was about three-fourths of an acre cleared and fenced. He chopped on the land until the spring of 1852, when he left it and went east. At the time he left, he leased the land by parol to one Blackwood, who was to use the three-fourths of an acre that was fenced, and was to clear up the two and a half acres that had been chopped. Blackwood occupied the land as tenant of *Lake* up to the time the mortgage was given, clearing up what had been chopped, inclosing it in a fence, and using it for raising turnips and potatoes, and for pasturing. The facts in regard to the possession of the sixty acre *Palmer* tract are very much the same as those relating to the *Lake* tract. There was a clearing upon it of three-fourths of an acre, which was inclosed in a fence. One Thompson cultivated this clearing for two or three years, commencing with 1853, as tenant of *Palmer*, and had charge of the land generally. It was well understood among the settlers of the country that *Lake* claimed to own one of these tracts, and *Palmer* the other, from 1851 or 1852. Thus both tracts were actually occupied and cultivated by the tenants of *Lake* and *Palmer*, as far as they were cleared,

when the mortgage was given by Eliza McCune to the railroad company. And the question is, Was there not such a visible, open and notorious possession and occupancy of each tract as would put a purchaser upon inquiry as to the character of the claim asserted in virtue of such possession? We think there was.

In *Ely v. Wilcox* (20 Wis. 524) the rule was laid down, that possession, to be notice, must be open, visible, exclusive, and unambiguous, not liable to be misunderstood or misconstrued. Now, it seems to us that the facts of this case bring it fully within the rule here stated. For what more notorious, open, visible and unambiguous acts of possession and ownership can be manifested over real estate, than by chopping, clearing up, fencing and actually cultivating between two and three acres of heavily timbered land? True, the number of acres is not large, yet it will cost as much time, labor and money to chop and clear up three acres of heavily timbered land, and make it fit for cultivation, as it will to make large improvements on the prairie. The possession and cultivation of a large inclosed field on the prairie, by raising wheat upon it, would not naturally be more observed by the public, or create a stronger presumption of notice, than such an improvement in the woods. And it is very plain that such unambiguous acts of ownership over land will never be confounded with mere acts of trespass. They are not liable to any such misconstruction. Considering the condition of the country, that it was sparsely settled and but a little cleared up, the clearing, fencing and cultivating one, two or three acres are such decided acts of ownership as will not fail to attract the notice of the public, as it seems they did in this case, and are of such a character as to be notice to a purchaser. Such improvements, under the circumstances, are open, visible, notorious and unambiguous, and are as striking evidence of the continued and complete possession of the land by the party who makes them, as

can well be imagined. For we do not understand the rule to be, that a person must actually reside upon the land, to make his possession notice. He may actually improve and cultivate it, and perform decided acts of ownership over it, without residing upon it. He may cultivate and improve it by a tenant; for the possession of the tenant is his possession. But here there were actual, visible and substantial improvements made, which would cost considerable labor and money to make them; land was cleared up, fenced and cultivated, and the occupation and possession were as notorious and exclusive as could have existed, unless *Lake* and *Palmer* had actually resided upon their several tracts. The occupation and possession were undoubtedly sufficient to constitute adverse possession under the statutes of 1849 (section 9, chap. 127, R. S. 1849); and we think they were so distinct and unequivocal in their character as to put a subsequent purchaser upon inquiry, and to operate as notice. We have examined a great number of decisions upon the question as to what must be the particular acts of ownership, what the use, cultivation and improvement, to make the occupation and possession notice to subsequent purchasers; and we think the weight of authority supports our conclusion that *Lake* and *Palmer* had such open, visible, notorious and unambiguous possession in this case as to be notice to the mortgagee of their rights.

The judgment of the circuit court must therefore be affirmed.

Dixon, C. J., *dissenting.* The question of notice, in cases of this nature, is a question of fraud, or bad faith. It stands upon the ground of fraud and bad faith in the subsequent mortgagee or purchaser for value; and equity never interferes to deprive him of the benefit of the legal title, except upon that ground, the proof of which must be most clear and satisfactory against him. It is not

enough that the proof raises a strong suspicion of guilt; but the guilty knowledge must be proved, or in lieu thereof, knowledge of such other facts and circumstances as will charge the purchaser with gross and culpable negligence in not having ascertained the truth — with a deliberate and guilty purpose not to inquire, because such inquiry would lead to actual knowledge of the superior adverse title or equitable claim. If, therefore, the facts and circumstances are such as to be consistent with good faith and innocence on the part of the mortgagee or purchaser, or such even as to leave it doubtful whether he was guilty of fraud or bad faith, equity will not disturb his title. These principles are elementary and familiar. They are fully discussed in the leading case of *Le Neve v. Le Neve*, 2 Lead. Cas. in Equity, 127, and notes. And see, particularly, *Jones v. Smith*, 1 Hare, 55, there cited.

In discussing this question of notice, in whatever form it may arise, courts should never lose sight of this fundamental principle upon which the doctrine is founded. The consequences of notice are most highly severe and penal, involving no less than a forfeiture of the entire title or estate of the party charged with it, as a punishment for his fraud. Courts cannot, therefore, be too guarded and cautious in the application of this doctrine, the liability to error in which has led so many courts and judges to regret that it ever existed at all, and inclined them to limit it to cases to which it has already been applied, and not to extend it to new ones. *Ware v. Lord Egmont*, 4 De G., Mac. & G. 473; *Attorney-General v. Stephens*, 6 id. 148; *Ford v. White*, 16 Beav. 123; *Fish v. Redington*, 31 Cal. 185. Every case should be carefully tested by the principle; and the questions should be: "Was the party guilty of fraud or bad faith? Did he acquire the legal title with intent to cheat and defraud his adversary? Does the testimony clearly and satisfactorily establish these facts?"

Vol. XXV — 6.

Now possession is but constructive notice of the title of the party holding it. It is not actual notice of such title. It puts the purchaser upon inquiry merely, and charges him with such knowledge or information as he would have obtained if he had inquired. *Knowing* that the premises are in the actual possession of some person other than his grantor, the law considers it an act of fraud and bad faith if the purchaser does not make the inquiry which such knowledge naturally suggests. It is a willful and intentional omission of duty, evincing a design and purpose on his part not to regard the rights of the party in possession, but to deprive and defraud him of them, whatever they may be. The punishment for such fraudulent and wicked conduct in a court of equity is to hold the purchaser, by construction or implication, to a knowledge of all such facts as he would have ascertained if he had inquired. This protects the rights of the party in possession, and places the purchaser where he ought to have placed himself.

The great controversy in cases where possession is relied upon as the ground of constructive notice is, and always has been, as to the nature and extent of such possession. *What is that possession which the purchaser in looking upon is bound to know is not the possession of his grantor, but is the possession of some third person?* Knowledge—actual notice—that the vendor is out of possession, and that some third person is in, must in all cases be brought home to the purchaser, or the charge of fraud or bad faith cannot be sustained against him. And this knowledge must not be the subject of doubt or speculation, or of probable inference even; it must be clearly and positively established.

It is with a view to this ingredient of fraud, and the positive proof required to establish it, that courts of equity have observed so much care in laying down the rule as to what that possession shall be which puts the purchaser upon inquiry, or operates as constructive no-

tice to him of the rights of the party claiming it. The courts have studiously endeavored so to restrict and limit the rule as that, by possibility, no innocent purchaser should suffer by it. Innocent purchasers are the especial favorites of courts of equity. It is well settled that no case can be stronger in equity than that of a purchaser who has put himself in peril by purchasing a title and paying a valuable consideration, without notice of any defect in it or adverse claim to it. Equity will not disarm but assist him. *Basset v. Nosworthy*, 2 Lead. Cas. in Eq. 52 ; *Boone v. Chiles*, 10 Peters, 210.

The facts of this case are in substance as stated in the opinion of the court, with one exception. The mortgage was executed in mid winter, February, 7, 1854, when there were no crops growing, cattle grazing, or other visible sign upon the land of any present use or occupancy whatever.

The mortgagee in this case was a corporation, having its place of business in the city of Milwaukee, distant about one hundred and fifty miles from the land in controversy. Let us take the facts just as they would have presented themselves to an agent of the mortgagee, if he had visited the premises at or about the time the mortgage was executed, for the purpose of ascertaining their situation, value, etc. What would such agent have seen? The two small unoccupied fields, with evidence, perhaps, of the previous season's cultivation, and here and there a stump in the woods showing that a few trees had been cut or taken from or used upon the premises. This would have been all, absolutely every thing, visible upon the lands themselves, to warn him that the mortgagor was not in possession, and that the defendants were. He would not have seen the cattle grazing in the woods, nor the growing beans, turnips, or potatoes.

My associates adopt the rule which was well laid down in *Ely v. Wilcox* (20 Wis. 531), "that possession,

to be notice, must be open, visible, exclusive and unambiguous; not liable to be misunderstood or misconstrued." Such are the qualities which must characterize the possession of the party who would set it up to defeat the title of the subsequent purchaser for value without notice, and whose conveyance was first recorded. They have been very carefully defined so as to conform to the principle which governs in such cases, namely, that fraud and bad faith must be shown on the part of such purchaser before his title can be disturbed. Such are the qualities which must have marked and distinguished the possession of the defendants, *Lake* and *Palmer*, at the time the mortgage was executed, showing unmistakably that it was *their* possession and *not* that of the party having the legal title of record. It must have been theirs *openly, visibly, unambiguously, and without liability to misunderstanding or misconstruction.* In what one of these particulars did their possession comply with the rule? I undertake to say, in none of them. Was it their *open, visible* and *unambiguous* possession! Was it their possession, *not liable to be misunderstood or misconstrued?* These are the questions to be answered, and answered as a stranger would answer them examining the premises for the first time, and with no other knowledge or information than such examination would give. The rule is established for the benefit of strangers—of any person who chooses to buy or receive in security. The registry is evidence to all the world of the state of the title, and who has it, and every one is entitled to deal with the person so having it as the true and lawful owner. Strangers may do so; and the question is, what would a stranger have said about the possession, had he seen it on the day the mortgage was made? Had the mortgagee sent an agent to examine, he in all probability would have been a stranger, and what would he have said? The answer is plain. He would have replied that there was

no person in actual possession; that the possession was vacant. And this was the precise character of the possession. It was what is called in cases of this kind a *vacant* possession, which imposes no obligation or duty of inquiry whatever. There was, therefore, nothing in the possession to bring it within the rule according to its true sense and application. The improvements indicated that some one had been, and, perhaps, then was, in possession to the extent of making such improvements, but they indicated nothing more. They did not indicate that they were made by these defendants, or by any one for them. For all that appeared they might have been made by any other persons in the world, and were as strong evidence of the possession of any other persons as of the defendants. They were improvements made according to the ordinary course of husbandry upon lands of the kind throughout the country. There was nothing strange or unusual in their character. They were just such as any owner would have made who was proceeding to open up a farm; and a stranger, knowing who the owner was, and proposing to buy of him, would have inferred that they were made by him or under his direction and authority. This inference would have been reasonable, just and proper — the only natural inference under the circumstances. It would have been the inference of the law upon the same state of facts on which the stranger was acting, because no one but the owner would have had the lawful right to make or cause them to be made. The conclusion, therefore, would have been, that the possession, so far as the state or condition of the premises indicated it to be actually in any person, was in the owner. If a stranger had bought under these circumstances, paid full value, and recorded his deed, would he not have acquired a valid title as against the defendants? With no other knowledge or information respecting the possession of the defendants than that which he had thus

derived, or could have derived, from an examination of the lands, could he have been found guilty of any fraud or bad faith? Could it have been said that there was any thing in the facts to have raised the slightest suspicion in the mind of an honest and prudent man, so as to have put him upon inquiry at all? It seems to me clearly not.

But if the transaction had taken place at a different season of the year, in summer, for example, when the crops were growing and cattle grazing, would the case have been any different? The buyer and seller go together to the lands, the buyer to examine and the seller to point them out. The buyer sees the improvements, the crops growing and cattle grazing, but sees no person on the lands exercising any acts of ownership or control. He has been informed by the seller that the lands are partially improved, and that he has growing crops and stock upon them. Or if he has not been so informed, he inquires of the seller, and the latter informs him that the improvements, crops and cattle are his—that he put in the crops, or employed laborers to do so, and to attend the cattle. Would not the buyer, a stranger, acting on the information furnished by the record that the seller was the owner of the land, have acquired a valid title under such circumstances as against all the world? The registered title, that shown by the record, is, to the stranger, or party having no other information, the only true one. To him the record imports verity. It is so intended by law; and when he acts upon it, he acts as one having positive knowledge that the party with whom he deals lawfully owns and may lawfully dispose, and that no other person has any title or interest whatsoever. In such a case the apparent possession of the owner and grantor becomes the real and only possession to the stranger and purchaser. The latter looks upon it and sees nothing inconsistent with the title, possession and representations of his grantor. Nothing is more common

than for lands to be owned, improved and cultivated in this way, without any actual residence upon or continued personal possession of them. The purchaser knows this, and, examining the land, sees nothing whatever, to manifest that any other person occupies or cultivates it. The possession is as manifestly and clearly that of his grantor as it can be that of any other person. But, more than this, he knows that his grantor owns it. He acts upon this knowledge and in this full belief, else he would not buy. To a person thus purchasing or advancing money upon a mortgage, what is there to put him upon inquiry? What is there to cause him to doubt or suspect? It seems to me nothing, clearly nothing at all. To affirm that there is, would be to affirm that a person so situated must act against all natural and legal presumptions and inferences, and must assume, because, by possibility, some other persons might have made the improvements and planted the crops, therefore that they did do so; and so the purchaser, before he can safely buy, must make a journey throughout the neighborhood, town or county, I know not how far, inquiring of every inhabitant until he finds such persons, or finds that he is mistaken in his assumption. This would be a most extraordinary rule of conduct for the law to prescribe in such cases, and the law does not do so. Parties claiming under unregistered deeds and conveyances cannot protect themselves by this kind of doubtful, uncertain and ambiguous possession. They must be upon the lands themselves, to warn purchasers and answer questions which may be put to them. Purchasers having no knowledge of the facts are not bound to go off the premises in search of information. It is the business of the parties claiming such rights to *bring* it to them on the lands. And the reason of this is obvious. The fault is with the parties whose titles are not recorded. The law has made full provision for the recording of all written instruments, properly acknowledged, etc., conveying any interest in lands, and if the

title or claim of the parties is not evidenced by writing, but is equitable and resting on matters *in pais*, the courts are open for their protection, and the *lis pendens* is provided to be filed in the office of the register of deeds. In all cases, therefore, parties may have their titles or claims, whatever they may be, registered in the proper office, and it is their wrong and their neglect that they are not so registered. The law contemplates and requires that they shall be. It is always the fault and the wrong of such parties, therefore, that inquiry should ever become necessary, or that purchasers or mortgagees for value should ever be put in jeopardy by reason of such unregistered titles.

So much for the question of possession in this case; concerning which I think it very clear that it was wholly insufficient to put a purchaser upon inquiry. It was not of a kind to show any notice to or knowledge in a purchaser that an adverse possession existed. The purchaser, as we have seen, must trust to *appearances* — to the *visible condition* of the premises at the time of sale, with respect to the fact of possession; and if there be nothing in these to awaken suspicion or cause inquiry, he must be held innocent, unless actual knowledge on his part be otherwise shown. The primary fact, therefore, or foundation, upon which the mortgagee must have been charged, if at all, with constructive notice of the defendants' equities, is wholly wanting. It is, of course, quite plain to be seen now, with all the facts in evidence before the court, that there was an adverse possession, at least for some purposes. As stated in the opinion of the court, the acts of the defendants may have been something more than mere trespasses, and may have constituted a disseisin, as between them and the holder of the legal title. But these are nothing to our present purpose. Because, with full knowledge of every fact, we can see that there was a change of possession as between the owner or mortgagor and the de-

fendants, it does not follow that a purchaser could have seen it. Indeed, it very clearly appears that he could not. And this seems to me to be the mistake, and the very simple one, on the part of the court, that, because we can see it, therefore the mortgagee or purchaser could.

But the evidence discloses some other facts which seem to enter into the consideration and judgment of my brethren. It was generally reputed throughout the neighborhood that *Lake* claimed one of the tracts, and *Palmer* the other; and their agents or tenants, Blackwood and Thompson, resided in the neighborhood. These are the additional facts, and the only ones. These neighborhood reports and ·rumors were proved by several witnesses; but there was no proof, or offer of proof, that any officer or agent of the mortgagee knew any thing about them. It was shown that Blackwood and. Thompson were agents to look after the lands and prevent trespassers from cutting the pine timber, etc.; but it was not shown, nor offered to be, that any agent or individual connected with the taking of the mortgage knew any thing about them, or that any such persons as they or their principals existed. The time has not yet arrived, I trust, when any person is to be convicted of fraud, and his property forfeited, upon such evidence as this. What would it have mattered to a purchaser, though the whole town had heard of *Lake's* and *Palmer's* claims, if he knew nothing about them? Could he have been found guilty of fraud on their knowledge? And what would it have signified to him, that their agents resided in the neighborhood, so long as there was nothing in the possession to suggest the fact that they, or any one else, had any interest in or control over the lands? The truth is, that all this testimony was irrelevant and inadmissible, and should have been excluded, and especially the evidence of rumors and reports. It is well settled that such rumors and reports, or mere

general assertions that some other persons claim a title, are not sufficient to affect a person with notice.    4  Wis. 1 ; 5 id. 443.

·  I come now to the examination of some authorities directly touching the questions which I have thus discussed.    And first I must refer to the case of *Ely v. Wilcox*, above cited, in this court, the facts of which will be found to have been very much stronger in favor of the party claiming by the unregistered conveyance than those here presented.    The facts unfortunately are not stated in the report, and I give them here as they appear from the record.    That was a tract of timbered land, situated in a new and sparsely settled country, upon which Ely, the owner and claimant by the prior unregistered deed, had a dwelling-house built of pine logs, hewed and well laid up, with shingle roof and glazed windows.    The house was sixteen by twenty-two feet on the ground, and in front of it was an inclosure which had been cleared and cultivated as a garden. Ely acquired his title November 1, 1854.    The conveyance to the defendant Wilcox was in May, 1856.    From the date of Ely's deed until within a few days before the date of that to Wilcox, Ely had lived very near the land, and during all the time had been exercising constant acts of ownership over it.    He had taken possession of the house and leased it to a tenant, by whom it had been occupied a considerable part of the time.    He and several men in his employment, together with a surveyor or surveyors, had worked upon the land for days together at different times, laying it out into lots and blocks as an addition to the town of Superior. Lines and openings were cut and cleared by him through the woods, indicating the different streets and the size and location of the blocks.    When the house was not occupied by his tenant it was used by himself and his men on such occasions to cook and sleep in.    At other times it was locked up, and he kept the key.    It was so

locked, and the key in his possession, when Wilcox purchased. His tenant had cut and taken wood from the land, and so had several other persons by his permission and direction. Such was the possession of Ely from November 1, 1854, to May 1, 1856, a period of one and one-half years, when he removed to a place about six miles distant. In less than one month afterward, namely, on the 27th of May, Wilcox acquired his title. It did not occur to the learned counsel in that case that neighborhood reports and rumors were competent evidence, for if it had, they could undoubtedly have proved, by one-half the inhabitants of the little village of Superior, the notoriety there of Ely's claim. If this had been proved, and also that he had an agent in the vicinity, could it have made any difference with the case? I think not. Either that case was wrongly decided, or judgment here should go against the defendants.

In *McMechan v. Griffing*, 3 Pick. 149, it was held that implied notice of a prior unregistered deed, to avoid a subsequent deed or attachment, must be *not merely a probable* but a *necessary and unquestionable* inference from the facts proved. Such inference cannot in all cases be made from an open, peaceable, and exclusive possession. Thus, where a person, owning and in possession of a part of a lot of land not divided by a partition fence, purchased the residue, consisting principally of wood land, and which had not been occupied by the grantor, repaired the fence around the lot, depastured cattle in it, sold trees from the part purchased, and removed an old hovel standing on the same part, it was held that these facts did not imply notice. And in the opinion the court say: "When a prior conveyance, not recorded until after one of a subsequent date, is attempted to be supported on the ground of fraud in the second purchaser, the fraud must be very clearly proved. This remark applies as well to implied as to express notice. The principle is the same in both. The

fact of notice must be proved by indubitable evidence; either by direct evidence of the fact, or by proving other facts from which it may be clearly inferred. It is not in such case sufficient that the inference is probable; it must be necessary and unquestionable." And again they say: "But it is not always true that a possession which, if adverse, *would constitute a disseisin*, would, under a deed not recorded, amount to implied notice. *The cases depend on different principles.*"

In *Buck v. Holloway's Devisees*, 2 J. J. Marshall, 180, the court say: "The only sensible rule is, that actual residence upon the land is notice to all the world of every claim which the tenant may legally assert in defense of his possession." It might be going too far to say, *a priori*, that this is in all cases necessary. But this, or something equivalent to it, must be shown. If the tenant is actually present on the land when the purchaser comes, so that he is seen in possession, that may suffice. There may be something in the nature of the improvements or use to warn the purchaser; as, if he sees a church, a school-house, or other public building on the land, or a public burial place, or a pond of water used to supply a mill on the lands of another, and the like.

The case of *Boggs v. Varner*, 6 Watts & Serg. 469, is a very clear, strong and well-considered case, involving the questions here presented. Both parties deduced their title from one John Irwin. John Irwin conveyed to John Boggs, who sold by parol to William Boggs, the plaintiff's ancestor. William Boggs entered and continued his possession until 1822, when he went down the Ohio, taking his family with him, but leaving the house and some of his furniture in the care and custody of his sister, intending to return, but he did not. The sister rented the property to a man named Steel, who continued to occupy it until the house and furniture were consumed by fire, in 1825. The defendant Varner claimed under a deed executed by John Irwin, dated

September 6, 1828, and recorded on the day of its date. The plaintiff, as rebutting evidence, offered, in connection, as follows: 1. A continued possession of the Boggses, up to December, 1825. 2. That James Varner (the defendant), during all this period, lived on part of what was originally the same lot, and was in habits of daily intercourse with the family of the Boggses. 3. The notoriety of the title of the Boggses, by every body in the neighborhood. The court overruled the offer, and sealed a bill of exceptions, and the case went up on this and one other question.

Upon this the court said: "It must be remembered that at the time of the purchase in 1828, no *person* was in possession, and that the property had been vacant from the time of the fire in 1825, a period of three years. *Had any person been living on the property* when it was bought by Varner, it is conceded it would be notice to the purchaser; for where there is a clear and unequivocal possession, it is constructive and legal notice, because it puts the purchaser on inquiry. 2 Watts, 275. *But to whom must the vendee resort for information of title? Undoubtedly to the person in possession when the bargain is made; for if the possession is vacant, it supersedes the necessity of further inquiry,* for no case has yet been ruled which extends the doctrine of constructive notice so far as to visit him with all the consequences of notice, because he may have known a person to have been in possession at any distant period of time before his contract. The law is not so unreasonable, and upon this point we do not wish to extend it further.

"The other parts of the offer were also properly overruled. There is no case yet where a jury has been permitted to infer the fact of notice, merely because the purchaser lived on the adjoining lot to the owner, or was intimate with him, or *because it was notorious in the neighborhood that he was the owner.* The evidence is too general, uncertain and indefinite to destroy a title

for which a valuable consideration has been paid by the buyer. The recording acts were specially intended for the protection of purchasers, and they would be of problematical benefit if a jury were allowed to act or draw inferences to his prejudice on such loose, unsatisfactory testimony. The provisions of the act may be easily complied with, and at but little expense, so that owners are left without excuse; and if they will neglect their duty in this particular, it is but just that the consequences be visited on their own heads. A court of equity acts on the conscience; and as it is impossible to make any demand on the conscience of a man who has purchased for a valuable consideration, *bona fide* and without notice of any claim on the estate, such a man is entitled to the peculiar favor of a court of equity. As every presumption is in favor of the subsequent purchaser, where the former owner is guilty of neglect his title cannot be postponed except by evidence which taints his conduct with fraud. And this, it is obvious, ought not to be done by testimony in its nature vague and indefinite, and leading to no certain results, such as that he ought to have known of the prior title because he lived near the owner, in the same town, perhaps, or on the next lot, and that he was well acquainted with him, or because the title was well known to others. *This may all be true, and yet at the time he pays his money he may be ignorant of any other title than his own.* It is not just that inferences should be strained in favor of the person by whose default the mischief has been done. We think the court was right in rejecting the evidence, because, admitting the truth of it, no legitimate conclusion adverse to the purchaser can be drawn from it. *When you seek to act on the conscience of the purchaser it must be by evidence direct and certain, and not vague and indeterminate.*"

And I invite particular attention to the case of *Meehan v. Williams*, 48 Pa. St. 238, to the facts and to the opin-

ion of the court by Strong, J. The party there, resid-
ing in the immediate vicinity, who had purchased the
land for the purpose of obtaining fuel, wood and coal,
and had used it according to the custom of the country,
cutting wood and taking coal or overdrift, asked an
instruction that this was sufficient notice of his claim,
which was refused. The court say: "It certainly is the
law that the possession of land, which is equivalent, in
effect, to notice of rights in the possessor, must be dis-
tinct and unequivocal. It must be occupancy—some-
thing more than successive and occasional entries on
the land. All the authorities agree that possession is
not notice, except during its continuance, and that, even
when his vendor is out of possession, a vendee is not
bound to take notice of the antecedent possession of third
persons. *A purchaser is bound to inquire only of those
on the land at the time of his purchase.* The authori-
ties are equally clear, that, to be effective as notice, pos-
session, *even at the time of sale,* must be distinct and
unequivocal." And again: "What makes inquiry a
duty is such a *visible* state of things as is *inconsistent*
with a perfect right in him who proposes to sell."

In *Campbell v. Brackenridge* (8 Blackford, 471) the
equitable owner had taken possession of the lot, built a
house upon it, moved into the house, and lived there for
three months. He then moved out of the house, leaving
it unoccupied, and about two months afterward the other
party acquired the title. It was held no notice. The
court say: "A purchaser, when the possession is vacant,
is not bound to inquire of the late occupier what was the
nature of his title, and will not be held to have implied
notice of the information which he might have obtained
by inquiry."

And the same rule was held by Sir J. Leach, V. C., in
*Miles v. Langley* (1 Russ. & Myl. 39), that, if the posses-
sion is vacant, the purchaser is not bound to inquire.

And, in *Smith v. Yule* (31 Cal. 180), one of the points

decided was: "If the *apparent* possession of land is *consistent* with the title appearing of record, it is not the duty of the purchaser to make any inquiry concerning the title, beyond what the recording office shows." The following is the language of the court: "Inquiry does not become a duty when the apparent possession is consistent with the title appearing of record. * * * Where the vendor is in the apparent possession, the subsequent purchaser, finding the title of record in the vendor, is put upon no further inquiry, because the possession appears to be according to the title."

These authorities are directly to the point, and fully sustain the positions for which I contend; and I know of none to the contrary. There are, no doubt, some loose and ill-considered cases in the books upon this subject of notice, and it is not impossible, in the multitude, that some may be found sustaining or seeming to sustain contrary doctrines; and if there be, it is because they are not well considered, and not because these doctrines are not the sound and true ones.

To the authorities above cited I would add the following: *Cook v. Travis*, 20 N. Y. 402, 403; *Hewes v. Wiswell*, 8 Greenl. 94; *Scott v. Gallagher*, 14 Serg. & Rawle, 333; *Billington v. Welsh*, 5 Binney, 132; *Hanrick v. Thompson*, 9 Ala. 409; *Plumer v. Robertson*, 6 Serg. & Rawle, 184; *Fort v. Burch*, 6 Barb. 60, 78; *Cook v. Travis*, 22 id. 338, 359; *Siter v. M'Clanachan*, 2 Gratt. 280, 313; *Grimstone v. Carter*, 3 Paige, 421; *Great Falls Co. v. Worster*, 15 N. H. 412; *Bell v. Twilight*, 2 Foster, 519; *Dickey v. Lyon*, 19 Iowa, 544.

Some stress is laid in the opinion upon the value of the improvements. I certainly need not dwell upon that, since the question of notice or fraud is in no possible way affected by it. The purchaser in good faith without notice buys and pays for the improvements with the land, and his title is certainly not to be defeated because they may have been of more or less relative value.

I have not gone through this case without noticing the fact that there was no proof or offer of proof, from beginning to end, to show that the mortgagee or any agent or officer *knew* the possession of the defendants, such as the proofs show it to have been. The authorities all proceed upon the principle that the party to be affected with constructive notice by possession must have *actual knowledge* of such possession, and this has raised the query in my mind, whether purchasers, buying on the faith of the recorded title, are bound at their peril to visit the premises and ascertain that there is no person in possession, claiming under an unrecorded deed or other title. This is a very important question, and I do not propose to discuss it at all. I wish merely to observe, that, if such be the law, as I find it very frequently assumed to be, the effect would seem to be to nullify the registry laws as to a very large class of cases — indeed, all cases where possession immediately follows conveyance. The point is noticed by the court in *Hewes v. Wiswell* (8 Greenl. 94), where it is said : " An entry and open and exclusive possession and perception of profits under an unregistered deed has often been considered and pronounced as equivalent to the registry of the deed. This cannot be correct; the language is too strong, and is on that very account deceptive." The court proceed to show very clearly that this cannot be true in particular cases, but do not advert to any general reason. It is the manifest spirit and intent of the registry laws, that all deeds and conveyances shall be recorded. They are enacted to afford a remedy against the mischiefs arising from secret or concealed conveyances, or secret or concealed charges upon estates. 2 Sugden on Vendors, 214, marginal paging. See also *Harris v. Arnold*, 1 R. I. 125 ; *Lessee of Henry v. Morgan*, 2 Binney, 502 ; *Vaughn v. Tracy*, 22 Mo. 415 ; *Scott v. Gallagher*, 14 Serg. & Rawle, 333 ; *Grimstone v. Carter*, 3 Paige, 421 ; *Cook v. Travis*, 22 Barb. 359 ;

and *Fleming v. Townsend*, 6 Geo. 103. "Now, it is obvious," says Sir Edward Sugden, "that no more effectual remedy could be devised than by requiring that every deed by which any interest in lands or tenements was transferred, or any charge created thereon, should be put upon the register, under the peril, that, if it was not found thereon, the subsequent purchaser, for a valuable consideration, without notice, should gain the priority over the former conveyance by the earlier registration of his subsequent deed." If, however, all purchasers are bound to take notice of the possession, or conclusively presumed to know it, as some of the authorities seem to suppose, then it follows that there can be no forfeiture when there is possession under an unregistered deed, and that parties taking possession need never record their deeds. They are just as safe without recording them as with. Entry and possession is fully equivalent to registry, and the penalty or sanction of the statute is entirely gone. Purchasers may proceed thus for generations, and so we have all the mischiefs, uncertainty and confusion which the statute was designed to prevent. Secret conveyances may exist, the same as before the statute was enacted, and creditors, purchasers and all others interested in estates be subjected to the same doubts, hazards and inconveniences, and the same expensive proceedings be required to settle questions of title. If such be the rule, I doubt its correctness, and doubt whether the statute allows such construction.

I think the judgment below should be reversed.

*By the Court.*—Judgment affirmed.